IN THE UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,  )
  )
  )
        Plaintiff,  )
  )
-vs-  ) No. 15-CR-182-JHP
  )
  )
SCOTT FREDRICK ARTERBURY,  )
  )
        Defendant.  )


TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE PAUL J. CLEARY

UNITED STATES MAGISTRATE JUDGE

APRIL 25, 2016



A P P E A R A N C E S


      Andrew J. Hofland, Assistant U.S.
Attorney, 110 West Seventh Street, Suite 300,
Tulsa, Oklahoma, 74119, attorney on behalf of the
Plaintiff;

      William P. Widell, Jr., Assistant Federal
Public Defender, One West Third, Suite 1225, Tulsa,
Oklahoma, 74103, attorney on behalf of the
Defendant.


REPORTED BY:      BRIAN P. NEIL, RMR-CRR
      United States Court Reporter

1          Monday, April 25, 2016

2                    * * * * *

3          DEPUTY COURT CLERK:  This is Case

4    No. 15-CR-182-JHP, USA v. Scott Fredrick Arterbury.

5    Counsel, please state your appearances for the

6    record.

7          MR. HOFLAND:  Andrew J. Hofland for the

8    United States, Your Honor.

9          THE COURT:  Mr. Hofland.

10         MR. WIDELL:  William Widell for

11   Mr. Arterbury, Your Honor.

12         THE COURT:  Okay.  Let me ask a couple

13   of things up front.

14         In the pleadings, there is a -- I think

15   there's an ongoing reference to Web site A, and I

16   guess there has been some effort not to identify

17   the actual Web site but it's all over the place

18   now.  I think, as Mr. Widell pointed out, it's been

19   the subject of a story in USA Today, it's been on

20   all these Web sites and Motherboard and everything

21   else.

22         Is there any reason why we wouldn't just

23   refer to this as Playpen?

24         MR. HOFLAND:  No, Your Honor, not at

25   this point.  And some of that was the time line we

1    were on when drafting began.

2              THE COURT:  Sure.

3              MR. HOFLAND:  But there's been a large

4    gap of time now to where we're at so I would agree,

5    Your Honor.

6              THE COURT:  And so my intention is that

7    when I get an order -- or an R & R out on this,

8    I'll just refer to Playpen and the Tor network, I

9    think is what we're talking about; right?

10        Okay.  Who wants to start?  Mr. Widell,

11   it's your motion.  Anything you want to add to

12   what's already in your papers?

13        And let me say at the outset that the issue

14   that I'm focused on, if you haven't gathered this

15   from the minute order I entered last week, is the

16   Rule 41 issue.  The other two issues don't seem to

17   me to rise to the level that I would -- I would

18   suppress evidence based on the warrant on the basis

19   of the description of the logo or the fact that the

20   warrant related to all activating computers, but

21   it's the Rule 41 issue that I'm most interested in.

22             MR. WIDELL:  In the instant case, as

23   opposed to Levin, the government concedes that the

24   search took place in the Northern District of

25   Oklahoma as opposed to the Eastern District of

1    Virginia.  The government explains -- and this is

2    on page 19 of its brief -- the government explains

3    the nature of the instructions caused the search to

4    be executed once packets of information arrived at

5    the user's device, which is, of course, here in the

6    Northern District.  The information sought to be

7    suppressed traveled from the user's device --

8    again, this is in the Northern District -- to the

9    Playpen site, again on page 19 --

10           THE COURT:  Is that where the -- when

11   the NIT warrant is issued and they put this -- it's

12   been referred to some opinions as "computer code,"

13   it's been described as "software" or "static

14   extraction software" -- but when that information

15   then is sent, the IP address, etcetera, does it go

16   back to the Playpen site or does it go to another

17   government computer, or do we know?

18           MR. WIDELL:  I'm assuming the Playpen

19   site because that's what it says in the

20   government's brief.

21           THE COURT:  And, Mr. Hofland --

22           MR. HOFLAND:  It goes to another

23   government computer in the Eastern District of

24   Virginia.  I think that's there in the briefings.

25   I know it may not have been abundantly clear.  But

1    it would require the computer -- the activating

2    computer to send that information to another

3    computer within the Eastern District.

4            THE COURT:  Okay.  That's kind of the

5    impression I had, was that it was directed to send

6    it to some other government computer.  All right.

7    But in any event, that's where it winds up is back

8    in the Eastern District of Virginia.

9            MR. WIDELL:  Rule 41(b)(2) allows a

10   magistrate to issue a warrant for personal property

11   outside the district if the personal property is

12   located within the district when the warrant is

13   issued but might move or be moved outside the

14   district before the warrant is executed.

15          The Levin court looked at this exact issue

16   and determined that the only object located within

17   the Eastern District of Virginia was the government

18   server, the activating computer was located outside

19   the magistrate's jurisdiction, and the server in

20   the Eastern District was not the device the

21   government sought to search.

22          In its explanation of place to be searched,

23   the NIT warrant made clear that the NIT would be

24   used to obtain information from various activating

25   computers; in other words, computers outside the

1   jurisdiction.  The activating computer was the item

2   to be searched.

3         Finally, we Levin court held that Rule 41

4   did not authorize the search because the actual

5   property to be searched was not the NIT or the

6   server on which it was located, but the user's

7   computer outside the jurisdiction.

8         In the instant case, as in Levin, there's

9   no indication that Mr. Arterbury's computer ever

10  traveled to the Eastern District of Virginia.  I

11  know there's some discussion about if you link in,

12  then perhaps you're in the Eastern District of

13  Virginia.

14        But, again, the language of Rule 41(b)(2)

15  says that the -- it's issue a warrant for personal

16  property outside the district if the personal

17  property is located within the district when the

18  warrant itself was issued.

19        There's no indication that he was linked in

20  or otherwise visibly present in the Eastern

21  District at the time the warrant was issued.  So I

22  think the plain reading of the statute requires

23  that Mr. Arterbury had to have been physically or

24  -- I guess an argument could be made he would have

25  to be linked in physically.  Certainly there's no

1    type of international standard where he availed

2    himself in the Eastern District at some point.  In

3    fact, when we look at Rule 41, we see Rule 41(b)(3)

4    and (b)(5) actual authorize searches outside the

5    jurisdiction.  So I think that's further clarity

6    that Rule 41(b)(2) and (4) are intended to do that.

7                    THE COURT:  Okay.

8                    MR. WIDELL:  Rule 41(b)(4).  In its

9    brief, the government also argues that (b)(4)'s

10   tracking device provision authorizes a magistrate

11   judge with authority to issue a warrant to install,

12   again within the district, a tracking device.

13         So, again, the magistrate's authority is to

14   issue a warrant to install some item that's already

15   within the district.  Again, the same argument:

16   There's no indication that Mr. Arterbury's computer

17   was either physically present at the time the

18   warrant was issued or linked in.

19         The government again in its trial brief

20   makes clear that NIT was not installed within the

21   Eastern District of Virginia but rather within the

22   Northern District of Oklahoma.

23         Additionally, Rule 41(b)(4) authorizes a

24   tracking device for the sole purpose of tracking

25   the movement of property.  In fact, when we look at

1    41(b)(4) -- or rather Rule 41, tracking devices,

2    it's defined in 18 U.S.C. 3117(b), and tracking

3    device is defined just as it is in Rule 41,

4    something that's intended to track movement.  The

5    warrant at issue -- the NIT doesn't track movement;

6    it collects data.  It, in no way, allows you to

7    determine where Mr. Arterbury's computer was at a

8    given point in time; it simply extracts computer

9    data, sensitive data, from it.

10           And I think that's a point to raise in the

11   Supreme Court's ruling in Riley v. California.  So

12   41 authorizes tracking of objects.  Riley v.

13   California -- and that's 134 S.Ct. 2473, a 2014

14   case -- the Supreme Court held that devices that

15   have significant data storage capacity are

16   fundamentally different from other objects.  With

17   access to an object that has significant data

18   storage capacity, like a cell phone, a smartphone,

19   a tablet, a laptop, not only can you track where a

20   device has been since the warrant was issued, but

21   you can actually track where the device has been

22   since the device was acquired.

23           Not only that, but it's different because

24   the storage capacity -- well, Riley says

25   quantitatively and qualitatively; quantitatively

1   because the immense storage capacity that these

2   devices have; and qualitatively because we see not

3   just an amount, but a type of data never considered

4   before, maybe not just finite access, but a

5   lifetime of access is out, data not just since he

6   acquired the computer, but scanned on from the

7   history of your life, financial records, medical

8   records, Internet browser sites, revealing all

9   sorts of personal information about an individual,

10  political, financial, sexual.

11        So we're not talking about putting a

12  tracking device on a car or bag and watching it

13  travel from one street to the next; we're talking

14  about putting malware onto a computer and

15  extracting data.

16        Another thing I want to make clear, too, is

17  that -- and I'll talk about this in a second -- but

18  Levin didn't -- the Levin court didn't form its

19  opinion on these ideas that I've just discussed.

20  They say it's simply not a -- simply not a tracking

21  device.  Which, again, if you read the definition

22  of a tracking device, it does not appear to be.

23        When we look at the committee notes from

24  2006 amendments, I think it says that the committee

25  did not intend by this amendment to expand or

1    contract the definition of what might constitute a

2    tracking device.  So, again, that's 2006.  My copy

3    is page 193, Judge --

4              THE COURT:  Okay.

5              MR. WIDELL:  -- the first full paragraph

6    on the left-hand column.

7          The Levin court cites the Tenth Circuit's

8    recent case of United States v. Krueger as

9    precedent for its determination that Rule 41(b)(4)

10   did not authorize the warrant.  The government

11   argues in Krueger that the agent knew exactly where

12   the computer was in another outlying jurisdiction,

13   and that the fact that he understood initially

14   exactly where the computer was and had the ability

15   to go to that district and acquire a warrant

16   somehow makes that case more egregious or this one

17   less egregious.

18         In the instant case, the government argues

19   that because agents, unlike in Krueger, lacked

20   knowledge as to the location of the activating

21   computer, they simply had no other choice other

22   than to ask the magistrate to issue a warrant for

23   computers that could be virtually anywhere in the

24   world, and probably were, certainly outside the

25   jurisdiction.

1              So, in other words, the government's

2    argument is that Rule 41 should be read more

3    liberally because there were limited options

4    available to the agents.  So there's nothing in

5    Rule 41 to argue for such a liberal reading.

6              In fact, when we look at the antiterrorism

7    section in (b)(3) and also (b)(5), we see that the

8    committee already made those rules more liberal and

9    allowed for that sort of thing.  No cannon of

10   statutory construction exists allowing a more

11   liberal over a more literal reading.

12             In any event, the alternative to a more

13   liberal reading, as pointed out in Levin, would

14   have simply been to have the district court judge

15   sign the second warrant.  The Levin court points

16   out that the district court judge was available to

17   sign the initial warrant for the servers, I think,

18   located in Florida.  So they certainly had a course

19   available to them that would have not necessitated

20   us being here.

21             THE COURT:  So the Rule 41 specifically

22   talks about magistrate judges, and I know in -- I

23   think even in Krueger, or maybe it's Levin, notes

24   that it's not a limitation on the jurisdiction of a

25   district judge.  So had the district judge signed a

```
 1   warrant like this, would it have been valid?
 2           MR. WIDELL:  I think so.  Of course,
 3   Levin also says you can amend the rule, change the
 4   rule.
 5           THE COURT:  Which they're in the process
 6   of doing.  And I think that's at the Justice
 7   Department's request, is it not?
 8           MR. WIDELL:  That would -- that would
 9   seem to be -- I don't know the answer to that
10   question.
11           MR. HOFLAND:  It is, Your Honor, in
12   part.
13           THE COURT:  And I believe it's up before
14   the Supreme Court right now --
15           MR. HOFLAND:  It is, Your Honor.
16           THE COURT:  -- for review, yeah.
17           MR. WIDELL:  So Levin didn't focus on a
18   plain reading of the rule; Levin sort of simplified
19   it and said it's not a tracking device.  It didn't
20   actually say it's not a tracking device because it
21   doesn't meet the statutory definition, it extracts
22   data rather than follows movement.  What Levin said
23   was the argument failed because the installation of
24   the NIT, which we consider malware actually -- it
25   seems to go on your computer and do something you
```

1    don't want it to -- occurred on the

2    government-controlled computer in the Eastern

3    District of Virginia.

4         Levin says the defendant was never in

5    control of the government's computer, unlike the

6    case in which a suspect drives car or carries a bag

7    into the jurisdiction and then boards a train or

8    plane to leave.  If the installation occurred on

9    the user's computer, the analogy likewise fails

10   because the computer was never physically in the

11   Eastern District of Virginia.

12        And, again, even if you want to read it a

13   little more liberally to say that linking in at

14   some point in the recent past created physical

15   presence, again, the statute -- or the rule

16   rather -- requires that Mr. Arterbury or the

17   property, one or the other, be present, whichever

18   they're seeking to track.

19        THE COURT:  Is the property that we're

20   focusing on here the computer or the information,

21   or does it matter?

22        MR. WIDELL:  I think it's the computer.

23   I think that's -- you know, that's what the --

24   that's what the warrant says, the activating --

25   well, the warrant says the activating users, I

1   think, rather than the computer.

2             THE COURT:  Right.

3             MR. WIDELL:  So I think I had just

4   assumed for whatever --

5             THE COURT:  Because I think in one of

6   the -- in the government's brief at one point they

7   say that he brought the property or brought

8   property to the Eastern District of Virginia, and I

9   wanted to be clear.  I mean, obviously, someone has

10  reached into the Eastern District of Virginia.

11  Whether they brought any property there, whether it

12  be the computer -- obviously not the computer --

13  but whether they brought the IP address in some way

14  into the Eastern District of Virginia, I don't know

15  that there's any evidence of that.

16            MR. WIDELL:  I think not.  The actual

17  Playpen site itself intentionally didn't acquire

18  the IP address, so not until the NIT is loaded onto

19  his computer does his computer send that

20  information forward.  And, again, in 2006, the

21  committee notes indicate clearly that there's no

22  intent to liberalize the definition of a rule.

23            Technical violation quickly.  The Levin

24  court made short work of that.  The government in

25  its briefing characterizes the violation as if, if

1    it exists at all, it's a technical one or a

2    ministerial one.  Clearly, it's a jurisdictional

3    issue.  I think the Levin court is correct, that a

4    jurisdictional issue is not a technical issue, it's

5    a substantive issue.

6          The Levin court found, you know, unlike

7    some other cases, that even if it is or was

8    considered -- characterized as a ministerial error,

9    that prejudice did exist, just from the fact that

10   if the magistrate hadn't -- you know, had followed

11   the rule, the warrant wouldn't have been issued.

12         I think what Levin could have also pointed

13   to was that prejudice means either the search might

14   not have occurred -- not would not -- but might not

15   have occurred or would not have been so abrasive.

16   I think if the magistrate had followed the rule,

17   not just the rule that says you can't go outside

18   your jurisdiction, but the tracking device part, it

19   would have been less abrasive in that only movement

20   or possibly location would have been acquired and

21   not all the other information was acquired as well.

22         So I think that we show prejudice by

23   pointing out that the search might not have

24   occurred and also the search would have certainly

25   been less abrasive if the rule would have been

1    followed because the agents would have been allowed

2    to collect sensitive data from the data storage

3    device.

4           I think the object is the computer.  The

5    reason I think that is when you get a warrant for a

6    car, now the information is not the car, the

7    information is where the car went to; or the object

8    is a bag, the information is not the bag but where

9    the bag went.

10          Likewise, in this case, the object was

11   Mr. Arterbury's computer.  The information is

12   supposed to be where his computer moved from the

13   district to somewhere else.

14              THE COURT:  If we -- if we assume here

15   for a second that the warrant here doesn't comply

16   with Rule 41 and that there is -- there is

17   prejudice, then we're faced with the suppression

18   issue.

19          The Michaud decision, which dealt with the

20   same scenario we're dealing with here, the court

21   simply said, well, the government would have gotten

22   that IP address eventually anyway, it's like an

23   unlisted phone number, and therefore, there's no

24   prejudice, we don't need to suppress.  Levin took a

25   very different approach on that.

1           So what's the right answer?

2                MR. WIDELL:  Two things.  First, we

3  don't have to show prejudice if we show substantive

4  error, jurisdictional flaw; second, you know, I

5  suppose it's possible the government might have

6  gotten the IP address in another way, but we show

7  prejudice again by the fact that the search should

8  have been less abrasive than it was.  If it's a --

9  if it's a substantive violation, then as the Levin

10 court says, it's a void warrant.  A void warrant is

11 like no warrant at all.

12               THE COURT:  And the good-faith exception

13 doesn't apply?

14               MR. WIDELL:  Good faith only applies to

15 searches pursuant to warrant.  So we don't even

16 have to reach that if we determine that -- we don't

17 even have to reach that if we determine that the

18 error was jurisdictional, which, again, it seems to

19 be.  We reach good faith on the issue of the IP

20 address possibly if we can't show prejudice.

21           So if we show error, we show no prejudice,

22 now we're stuck with the IP address, then the

23 argument, I suppose, is that there were -- there

24 was other data collected, other than the IP

25 address, that implicates Mr. Arterbury that should

1    certainly be suppressed.

2           Assuming by showing prejudice, either -- or

3    assuming no need for prejudice because it's

4    substantive or prejudice with a technical error, I

5    think where we are with good faith is either if

6    there's a -- if there's a -- if there's a valid

7    warrant, I think we're in trouble, as far as good

8    faith goes.  If there's not a valid warrant; in

9    other words, the warrant's void as opposed to

10   voidable, then good faith simply doesn't apply and

11   we don't need to pursue that issue.

12           THE COURT:  Okay.  Right.

13           MR. WIDELL:  I think that's what I have

14   to say in addition to the briefing on Rule 41.  If

15   you have anymore questions, I'll --

16           THE COURT:  Okay.  And is there anything

17   -- I mean, the cases that I found out there that

18   deal with our scenario, I got Michaud out of

19   Washington and then Levin came down just last week,

20   but I haven't seen any others out of the same sort

21   of -- I'll call it the sting separation.

22           Is anybody aware of anything else?

23   Mr. Hofland.

24           MR. HOFLAND:  Yes, Your Honor.  Pursuant

25   to the court's minute order in this case to address

1   Levin, I also found three other opinions from three

2   other districts that denied the motion to suppress.

3   I've provided a courtesy copy to the court of those

4   opinions and opposing counsel.

5           In chronological order, that's United

6   States v. Michaud, M-i-c-h-a-u-d, from the Western

7   District of Washington --

8           THE COURT:  Right.  That's the one we've

9   talked about a little bit already.

10          MR. HOFLAND:  Additionally, there in the

11  Southern District of Ohio is United States v.

12  Stamper, and that is a case out of the Southern

13  District of Ohio, the Western Division, that is

14  Case No. 15-CR-109 for that district.

15          And then additionally, there was a decision

16  in the Seventh Circuit in the Eastern District of

17  Wisconsin, which is United States v. Phillip Epich,

18  E-p-i-c-h, for the Eastern District of Wisconsin,

19  that's Case No. 15-CR-163.

20          I intend to address those.  I know the

21  court hasn't had much opportunity but --

22          THE COURT:  Yeah.  Why don't you step up

23  and -- you folks have your pretrial tomorrow;

24  correct?

25          MR. HOFLAND:  Yes, Your Honor.  It's our

1    understanding that the judge has already addressed

2    the fact that we have an ability to respond to your

3    report and recommendation.  So my understanding is

4    that it's going to be passed again.

5              THE COURT:  All right.  Good to know.

6              MR. HOFLAND:  Your Honor, just taking up

7    the issues --

8              THE COURT:  Does everybody agree that

9    41(b)(3) and 41(b)(5) aren't applicable in any way

10   here?

11             MR. HOFLAND:  Yes.

12             THE COURT:  We're only dealing with

13   41(b)(1), (2), or (4)?

14             MR. HOFLAND:  Yes, Your Honor.

15             THE COURT:  Okay.

16             MR. HOFLAND:  So, first of all, when

17   we're viewing Rule 41(b), I disagree with defense

18   counsel's assertion that a strict application is

19   the only application.  The courts have found

20   routinely that in cases of ambiguity, we're going

21   to encourage or show a preference for warranted

22   searches, as opposed to warrantless searches, in

23   which we'll be creating incentive for law

24   enforcement to cite exigency and attempt not to

25   follow Rule 41 or seek warrants from magistrates.

1       And some citations that hold that very

2   premise, originally -- well, the Supreme Court

3   originally -- and this is an older case from 1977

4   -- in United States v. New York Telephone Company,

5   that's 434 U.S. 159, that dealt with the Supreme

6   Court upholding a 20-day search warrant for a pen

7   register to collect dialed telephone number

8   information despite the fact that the definition of

9   "property" at the time did not include information

10  and that the search be conducted within ten days.

11      So there, there was an issue where it

12  outlasted the time in which it was supposed to be

13  conducted and it didn't meet the technical

14  definition because back then "property" wasn't

15  defined as information.

16              THE COURT:  Okay.

17              MR. HOFLAND:  Regardless, the court

18  explained in that case Rule 41 -- the Supreme

19  Court -- Rule 41 is sufficiently flexible to

20  include within its scope electronic intrusions

21  authorized by a finding of probable cause and

22  noticed that this flexible reading was bolstered by

23  Rule 57(b) which provides, "If no procedure is

24  specifically prescribed by the rule, the court may

25  proceed in any lawful manner not inconsistent with

1  these rules or with any applicable statute."

2       So there is a history of reading Rule 41

3  more broadly assuming that it is, in the terms of

4  the Supreme Court, not inconsistent with these

5  rules or with any applicable statute.

6       There's also persuasive authority.  The

7  Ninth Circuit and the Seventh Circuit have taken it

8  up more recently, the Ninth Circuit in the case

9  United States v. Koyomejian, which is

10  K-o-y-o-m-e-j-i-a-n, that's 970 F.2d 536 (9th Cir.

11  1992).  The Ninth Circuit interpreted Rule 41

12  broadly to allow prospective warrants for video

13  surveillance despite the absence of provisions in

14  Rule 41 explicitly authorizing or governing such

15  warrants.

16       And then the Seventh Circuit in 1984 in the

17  case of United States v. Torres, T-o-r-r-e-s, 751

18  F.2d 875, (7th Cir. 1984), the Seventh Circuit

19  observed that denying the court's authority to

20  issue warrants for searches consistent with the

21  Fourth Amendment would encourage warrantless

22  searches justified by claims of exigency and --

23  quoting them -- they say, "Holding that federal

24  courts have no power to issue warrants authorizing

25  an investigative technique might simply validate

1    the conducting of surveillance without warrants.

2    This would be a Pyrrhic victory for those who view

3    the search warrant as a protection of the values in

4    the Fourth Amendment."

5         And that last quote by the Seventh Circuit,

6    I think, is especially important here.  The bottom

7    line is that technology is going to outpace the

8    law.  And so when law enforcement in a case like

9    this does -- it's not out of a laziness -- which

10   some people would comment on United States v.

11   Krueger, that that was out of laziness knowing that

12   there was property in the Western District of

13   Oklahoma -- it's not out of laziness, it's out of

14   the defendant, and defendants like him, and their

15   choice of using encrypted end-to-end encryption to

16   thwart law enforcement that we find ourselves with

17   this issue.

18        To clarify a technical issue of what was

19   already discussed, what we are talking about here

20   under Rule 41 is information.  That is the property

21   that we're talking about.  In Rule 41, as I

22   included in my brief on page 19, the definition of

23   "property" includes tangible objects or

24   information, and that's what we're talking about

25   searching here.

1          THE COURT:  But isn't it -- but you're

2     not going to get that information unless via the

3     malware you seize control of Mr. Arterbury's

4     computer and direct it to provide you that

5     information.

6          MR. HOFLAND:  Without -- without

7     engaging in semantics, effectively, yes, Your

8     Honor.

9          But what I would point out, which is, I

10    think, a difference in your discussion with defense

11    counsel just previously, is this information, an IP

12    address, which is the crux of what was achieved

13    here, the IP address is what allowed further

14    investigative techniques to happen in this district

15    and to obtain a particular search warrant for

16    Mr. Arterbury's residence.  So what we're really

17    talking about is how do we achieve the IP address.

18         And as -- without calling an agent to

19    further explain something that's outside the four

20    corners of the affidavit, I can point the court's

21    attention to Exhibit 1 of my brief, which is the

22    NIT warrant itself.  On pages 24 and 26, they

23    specifically discuss that IP address information is

24    information that a user, when he accesses a Web

25    site readily gives up in order to receive contents

1    and packages of information back from the Web site.

2         So had we not been in an environment where

3    there is end-to-end encryption used by the

4    defendant, this is information that we could have

5    used Rule 41(b)(1) to obtain a search warrant in

6    the Eastern District of Virginia because on the

7    server where the defendant is reaching to --

8         THE COURT:  Right.

9         MR. HOFLAND:   -- we see his IP address.

10   That happens as a regular course of business

11   technologically.

12        So when we're talking about this case with

13   the end-to-end encryption but we start considering

14   now Rule 41(b)(2) and (b)(4), we are -- we are

15   looking for the exact information, which is covered

16   by the definition under Rule 41(b), that the

17   defendant willingly by his surfing conduct, or his

18   Web surfing conduct, willingly gives to that server

19   but for this encryption.  So we really are talking

20   about packets of information of the defendant

21   reaching into the Eastern District of Virginia.

22        There's no doubt that we have zero evidence

23   that Mr. Arterbury ever walked to the Eastern

24   District of Virginia himself personally or that he

25   schlepped his computer to the Eastern District of

1   Virginia.  But what we're talking about is the bits

2   of information that would have been available in

3   the regular course of Web surfing but for the

4   end-to-end encryption, really the information which

5   is the IP address.

6           THE COURT:  But if -- even if you

7   captured even the encrypted IP address in the -- in

8   the Eastern District of Virginia, you couldn't have

9   done anything with it.

10          MR. HOFLAND:  That's correct, Your

11  Honor.

12          THE COURT:  So whatever you've got is

13  meaningless and useless unless you send the malware

14  back to his computer in Oklahoma and say, okay,

15  computer, we need for you to give us the IP address

16  and this other information and send it back here.

17          MR. HOFLAND:  That is correct, Your

18  Honor.  But in terms of --

19          THE COURT:  I mean, it would be

20  different -- I would agree with you if -- if what

21  you had was some sort of -- you had captured in the

22  Eastern District of Virginia an encrypted IP

23  address, which you then proceeded to de-encrypt and

24  had the property but it had been hidden, but

25  through use of a warrant or some technique you were

1  able to get the information that had been brought

2  in.  But that's not case.

3           MR. HOFLAND:  You're correct, Your

4  Honor.  And as I think is laid out sufficiently in

5  Exhibit 1, the NIT warrant itself, simply not

6  possible.

7           THE COURT:  Right.

8           MR. HOFLAND:  No matter what he did,

9  based upon the way this end-to-end encryption

10  worked with these nodes, it's simply not possible

11  for us to de-encrypt the information.  Even the

12  last exit node or the server itself has no idea who

13  the activating user is on the other side of these

14  relay nodes.

15           THE COURT:  And that's the problem I

16  have with Michaud, is when the judge without any

17  citation says, well, this is just like an unlisted

18  phone number and they would have gotten at it

19  eventually anyway, I've got a problem with that,

20  particularly because the McFarland affidavit is

21  completely contradictory to that.

22           MR. HOFLAND:  Well, yes, Your Honor.  I

23  think that gets to prejudice, which I'd like to

24  address in a moment.

25           THE COURT:  Okay.  Sure.

```
 1              MR. HOFLAND:  But just for

 2   framework-wise --

 3              THE COURT:  Sure.

 4              MR. HOFLAND:  -- I want to talk about

 5   Rule 41(b)(2) and (b)(4).

 6              THE COURT:  Okay.

 7              MR. HOFLAND:  I know the Levin court

 8   gives it somewhat sort shrift.  There are very

 9   short paragraphs where he simply denies out of hand

10   that these are applicable.  But when we're talking

11   about packets of information that are coming into

12   the Eastern District of Virginia, I think that is

13   helpful for us to view the framework that's

14   currently in place.  And granted it was written at

15   a time where we didn't have this particular issue

16   of end-to-end encryption, but when we understand,

17   looking back at those other cases I cited, as to

18   even though technology may be ahead of the rule,

19   are we within the spirit or the scope of the rule?

20         I think that this is not even a violation

21   of Rule 41(b)(2) and (b)(4), (b)(2) being that if

22   the property, meaning the tangible object or the

23   information that is to be sought, is within the

24   Eastern District of Virginia, which I submit that

25   it was because of his surfing habits, that he was
```

1   giving something through his computer to that

2   server to be able to retrieve something back, which

3   is this IP address, that because that puts

4   Mr. Arterbury in -- or that information in the

5   Eastern District of Virginia; and then under (b)(2)

6   we're allowed to, if that information is going to

7   move out of the Eastern District of Virginia, to

8   track it or to search where that information may

9   go, which is what (b)(2) posits, and that's exactly

10   what happens in this case.

11         Now, again, it's not going to be a perfect

12   fit because we're talking about something that was

13   you know invented after these rules were created.

14         THE COURT: Right.

15         MR. HOFLAND: But cognitively when we

16   look at what we talked about before, it's

17   effectively the same thing that we're having to

18   search here but we're authorizing a search where

19   this information or property goes, which in this

20   case is back to the Northern District of Oklahoma.

21         And simply another way, in almost the

22   penumbra of (b)(1), (b)(2), and (b)(4) when read

23   together, we also have the tracking device analogy,

24   which I think is actually very apropos. I gave my

25   analogy to it with the Holland Tunnel.

1              THE COURT:  The Holland Tunnel.

2              MR. HOFLAND:  But, I mean, I think

3    that's right.  We can put a tracker on something in

4    one district, we can have technical reasons why it

5    doesn't continue to be -- or give us a homing

6    signal, but when it travels in another district we

7    can continue to retrieve that location information.

8              As put in my brief on page 19, the tracking

9    device is considered either a mechanical or

10   electronic device.  That's effectively what this

11   is, granted all in a digital or cyberworld.

12   Attached to the packets of information

13   Mr. Arterbury was receiving was these instructions

14   or this code, and so that is our tracking device,

15   the electronic device, that's attached to digital

16   information that traveled back to the Northern

17   District of Oklahoma where the path was absconded

18   from us because it's an end-to-end encryption, but

19   we see it going out and we see it where it ends up,

20   just as if it pulled out on the other side of the

21   Holland Tunnel.

22             THE COURT:  If it was just tracking, you

23   would track the information back to the Northern

24   District of Oklahoma and the tracking portion would

25   be over, but then the next step is the malware

1    seizes control of the computer and sends

2    information back to the Eastern District of

3    Virginia that Mr. Arterbury never intended to

4    happen.

5              MR. HOFLAND:  Well, the key, Your Honor,

6    is, what information are we looking for?  Because

7    this is where we differ from what the defense's

8    brief talks about in In Re: Warrant from the

9    Southern District of Texas.

10             THE COURT:  Right, right.  Where they

11   wouldn't issue the warrant.

12             MR. HOFLAND:  That was an out-and-out --

13   the proposed warrant was an out-and-out search of

14   the computer, much like we would forensically do to

15   say file structure and images and things on the

16   computer.

17        Here, this is very different because the

18   scope of what was being asked for is what the

19   computer emits once he travels on the Internet to a

20   Web site, which is the IP address.  This is

21   information that the defendant freely gives up by

22   surfing the Internet anytime he connects to the

23   Internet.

24        So really when we're talking about

25   searching the computer, it's not for searching

1  underlying file structure, anything that he would

2  have a reasonable expectation of privacy in; it's

3  simply another means of showing that information

4  that he's pulling out every time he travels out

5  just in an unencrypted manner.

6         So it's not a perfect fit to say this is --

7         THE COURT:  If it was a perfect fit, you

8  wouldn't -- the government wouldn't be trying to

9  amend Rule 41 right now to solve the problem.

10        MR. HOFLAND:  That is true, Your Honor.

11  At some point we need to catch up in the same way

12  that after the Supreme Court decision we said that

13  property included information.  At some point we

14  need to catch up.

15        And so -- but I don't think it's because of

16  the fact that they're creating an on-point -- or

17  trying to create an on-point Rule 41, I guess,

18  (b)(6) or something to address this situation, it

19  doesn't mean that it's not currently addressed.

20        The reason why I think that's the most fair

21  reading of this, in addition to the case law where

22  we talk about the liberal construction, is because

23  when we have law-enforcement agents who are trying

24  to identify illegal criminal activity -- and we

25  talked a little bit about the horrors of what's

1    going on as far as new content and the creation of

2    child pornography being really the gravity or the

3    gravamen of what this site was for, people to

4    create and share -- we want law enforcement to be

5    able to try to use the courts to achieve

6    information in these sorts of cases.

7         And so what do we have?  We have a

8    law-enforcement agent in the Eastern District

9    Virginia at that point coming to the only place

10   where it would make any sense for anybody to go, as

11   far as a jurisdiction, which is the Eastern

12   District of Virginia where the server was located,

13   and attempting to retrieve court authorization to

14   do the very thing that they did which the court

15   then approved.

16        So to then now deny that -- or grant a

17   motion to suppress is to say it should -- we

18   shouldn't try to use Rule 41 or that somehow Rule

19   41 simply didn't allow us to investigate these

20   cases.  And that simply can't be the sensical

21   reading in light of the totality of the case law

22   and in light of the way that Rule 41 is structured

23   was that simply some people are going to be outside

24   of the -- outside of our law when we seek court

25   authorization.

1          THE COURT:  What happens, though, when a

2    magistrate judge is presented a warrant like this

3    and has no idea really where the packet of

4    information or the computer ultimately lies?

5          I mean, when this magistrate judge signed

6    the NIT warrant, she didn't know whether the

7    ultimate target was going to be in the Eastern

8    District of Virginia, in which case we're probably

9    not having this discussion, or it's outside the

10   Eastern District of Virginia but inside the United

11   States, or it's outside the United States.

12         What does -- what difference does it make

13   in your analysis?  Under Rule 41, does it make any

14   difference at all?

15         MR. HOFLAND:  Your Honor, Rule 41(b)

16   provides for extraterritorial jurisdiction on

17   search warrants, and that's what (b)(2) and (b)(4)

18   and then under very particularly circumstances,

19   (b)(3) and (b)(5) contemplate.

20         So when we're talking about whether or not

21   Rule 41(b) is meant to allow extraterritorial

22   jurisdiction over warrants, the answer is yes.  And

23   in reading it in a fair light, in a light that

24   we're reviewing new technology in terms of the

25   framework we have, I think it does authorize it

1    even thought she didn't know where it went.

2            You know, another reason why we can say why

3    we know that the federal courts allow this -- or

4    contemplate this sort of investigative technique is

5    we also have anticipatory warrants; right?  So if

6    we were to want to search a -- we have a drug mule

7    who's a cooperator, and we know that the drug mule

8    is going to be going on a run but he's not told

9    where he's going, we can also seek anticipatory

10   warrants that would allow when a triggering event

11   occurs, like when the drug warrant is -- or excuse

12   me -- when the drug mule is finally given the

13   address or directions on the freeway as to where

14   he's supposed to go, we can also have warrants that

15   allow us to search that location given

16   anticipatorily, even though we don't know at the

17   time where the person is necessarily going.

18           So, again, when we look at all the

19   different ways that there is codified or, in the

20   rules at least, an ability to look for information

21   from outside the district that you're applying for

22   it in, we see that the court does authorize these.

23   They're not -- they're not as commonplace but they

24   do authorize these types of warrants.

25           THE COURT:  But the fact that 41(b)(3)

1    very specifically says when -- I mean, when you

2    look at 41(b) overall, there's a territorial limit

3    placed on the power of a magistrate judge to issue

4    a warrant.

5         Now, you get to 41(b)(3) and the rule says,

6    now, wait a minute, if it's terrorism, domestic or

7    international, all bets are off and you can issue a

8    warrant to go anywhere; right?

9         MR. HOFLAND:  Yes, Your Honor.

10        THE COURT:  Does the fact -- I mean, why

11   wouldn't they have included child pornography cases

12   in 41(b)(3), if that's what they intended?  I mean,

13   if we're going to do away with any sort of

14   territorial limit in situations like this, I mean,

15   it seems like they saw the need to do it and they

16   put it in (b)(3).

17        MR. HOFLAND:  Your Honor, so Rule 41(b)

18   is going to have amendments based upon an ill

19   that's trying to be cured, I guess, such as the

20   telephone company then defining property

21   differently.

22        Clearly what we're talking about in that

23   situation, when we're talking about

24   counterterrorism, is exigency but now codified;

25   right?  So we already can seek -- not need a

1    warrant under exigent circumstances but, again,

2    there's a preference to get a warrant.

3           So what they did is effectively when we're

4    talking about counterterrorism, they said, this is

5    an exigent circumstance, but no longer do we want

6    you to worry about whether or not you should not

7    seek a warrant.  We prefer you do seek a warrant

8    and now we're going to give you officially an

9    avenue to do so you stop doing exigent

10   circumstances, and that way we can -- the courts

11   can have authorization which will likely make it

12   more bulletproof.

13          The fact that now there's a differing type

14   of technology, which is making what normally would

15   be a Rule 41(b)(1) warrant pretty simple, let's

16   just search the server and find his IP address,

17   because now there's a proposed change on that

18   doesn't mean it's simply not there because (b)(3)'s

19   there and it doesn't contemplate child pornography.

20          And to that point about both Rule 41 and

21   the preference to Rule 41, but then also kind of

22   alternatively the prejudice, in this case when

23   we're talking about whether or not this should be

24   suppressed, I think this court can hang its hat on

25   exigent circumstances.

1        There's a footnote at the end of my brief,

2   and due to, I guess, page limitations I don't know

3   if the issue was fully fleshed out, but in that

4   footnote at the end of my brief we talk about

5   exigent circumstances.  Within Exhibit 1 of our

6   brief, where it is the NIT search warrant itself,

7   it talks about the great harm that's happened and

8   effectively that the information is fleeting.

9   People are harming children in realtime.  People's

10  information are traveling in through this relay

11  node and leaving.  And if we don't capture it in

12  that two-week period of time, those people

13  effectively got away with it.

14       THE COURT:  Well, but it bothers me a

15  little bit, the exigent circumstances argument,

16  when it's the government that left the server and

17  let this continue on.  I mean, I know how strictly

18  you guys are with defense counsel when they want to

19  come in in child pornography cases and look at what

20  the evidence is and they're not allowed to take it

21  out and they have to sketch it and all that.

22       And here we are with the government saying,

23  well, we're going to let this -- we're going to let

24  this operation continue and let people traffic in

25  child pornography for awhile in the hopes that we

1    can catch many, if not all, of them.

2              MR. HOFLAND:  Yes, Your Honor.  And

3    certainly for the decision-makers that took out

4    this warrant it was a difficult decision.  What I

5    think is addressed within the warrant itself is the

6    concept that when you take one of these sites down,

7    another one pops of immediately in its place.

8              THE COURT:  Yeah.

9              MR. HOFLAND:  And so dealt with the --

10   given the option in this particular circumstance of

11   taking down this one Web site administer and then

12   taking down the site and then letting folks share

13   on the next marketplace that was going to pop up

14   like -- and have a game of whack-a-mole, they

15   decided that they were going to attempt to find the

16   individual users that are sharing in child

17   pornography, even individual users that are harming

18   children.

19              I can tell you that even out of Operation

20   Pacifier, based upon the search warrants, they were

21   able to rescue kids who were being abused in

22   realtime.  And if the court's interested, I can

23   bring out a supplemental exhibit which provides a

24   summary of some of those realtime curers that have

25   already been -- the rule time ails which have

1   already been cured by the Operation Pacifier, which

2   really does raise the question about exigent

3   circumstances in the content and what's going on in

4   that particular case.

5           So I think I've explained why I think Rule

6   41, based upon the way that it should be read, is

7   as flexible and in a more liberal construction than

8   a strict construction based on the history of it,

9   and then looking at Rule 41(b)(1), (b)(2), and

10  (b)(4), why under these circumstances we should not

11  find a violation of Rule 41.

12          THE COURT:  Now, the NIT warrant when it

13  was presented to the magistrate judge very clearly

14  said it was to search and seize property located

15  within the Eastern District of Virginia.

16          MR. HOFLAND:  And that -- I believe it

17  also discusses, you know, the activating users.

18          THE COURT:  Right.

19          MR. HOFLAND:  So I think maybe it might

20  have stated Rule 41(b)(1), which in terms of the IP

21  address is true, that is information that traveled

22  into the Eastern District of Virginia.  But because

23  they're talking about the authorizing computer as

24  well --

25          THE COURT:  Did this IP address even

1    encrypted travel into the Eastern District of

2    Virginia?  Because I thought from McFarland's

3    affidavit he was saying that all they could do with

4    the information that was in the Eastern District of

5    Virginia is track it back to the last exit node,

6    and they didn't have the ability to go any farther

7    without the NIT process.

8            MR. HOFLAND:  That's correct, Your

9    Honor.

10           So what we're talking about, I guess, is,

11   is information or are packets of data traveling

12   from the defendant's computer into the Eastern

13   District of Virginia?  And the answer is yes.

14   There's no way for him to view anything on that

15   server if he's not reaching out through the

16   Internet, if he's not sending packets of data.

17           Simply put, there's no way for me to

18   download from any server on the Internet without

19   sending something out, sending packets of

20   information out.

21           THE COURT:  Right.

22           MR. HOFLAND:  So what happened here is,

23   the routine information that's sent out -- and,

24   again --

25           THE COURT:  The routine packet would

1    include the IP address?

2              MR. HOFLAND:  It does.  I mean, as he's

3    searching, even on the Tor network, what's going

4    out are certain statistics about his computer, the

5    IP address, the MAC address, other items that say

6    what's coming out across the Internet.  And just

7    what happens is, from the entry node to the exit

8    node and on the relays, they encrypt another level

9    and another level and another level so that what

10   comes out of the exit node is still that

11   information, it's just highly encrypted.

12             So the defendant did reach into the Eastern

13   District of Virginia.  It's just when he reached

14   into the Eastern District of Virginia, it was still

15   an IP address but an IP address that was heavily

16   encrypted and unable to be de-encrypted without

17   some further instructions or code.

18             So --

19             THE COURT:  But then, you couldn't take

20   what was in the Eastern District of Virginia, even

21   with some sort of NIT technique, and de-encrypt it

22   in the Eastern District of Virginia?

23             MR. HOFLAND:  Not --

24             THE COURT:  You had to send something

25   back to the Northern District of Oklahoma saying to

1    the computer, okay, we can't figure this out,

2    computer, gather up this information and send it to

3    this computer in the Eastern District of Virginia?

4                MR. HOFLAND:  Yes, Your Honor.

5                So even if we -- even if we say that to the

6    letter of Rule 41(b), there is nothing that

7    specifically addresses what happened in this case,

8    it really is a technical violation, not a

9    substantive one.

10               And I understand what the judge said in the

11   Levin court, but he is an outlier with the other

12   courts that have denied the motion to suppress.

13   What's interesting as well about Levin's decision

14   is Levin does cite to Krueger --

15               THE COURT:  A lot.

16               MR. HOFLAND:  -- which is a Tenth

17   Circuit court --

18               THE COURT:  Right.

19               MR. HOFLAND:  -- and he cites to -- and

20   I'm going to butcher his name -- Gorsuch's --

21               THE COURT:  Gorsuch.  Judge Gorsuch,

22   yeah.

23               MR. HOFLAND:  -- Judge Gorsuch's

24   concurrence, but the analysis that occurs in

25   Krueger is the analysis given to us in the Tenth

1    Circuit, the standing analysis, in Pennington.

2              THE COURT:  Right.

3              MR. HOFLAND:  So in the Tenth Circuit,

4    what we have here is in the instance of a Rule 41

5    violation, we go through a certain analysis.

6              Levin -- the Levin court doesn't touch on

7    that analysis; it simply says this was not

8    technical, simply there's no jurisdiction, we have

9    no warrant.  But the problem is that even the case

10   that he cited not from his district but, our

11   district here -- or our circuit --

12             THE COURT:  Right.

13             MR. HOFLAND:  -- is an analysis where in

14   Krueger they went through the steps.  And even

15   though Krueger had a similar type problem with the

16   specifics of Rule 41(b)(1), (2) -- well, (b)(1),

17   which is a question of jurisdiction, the Tenth

18   Circuit still went through all of those Rule 41

19   violation tests, which tell me that at least in the

20   Tenth Circuit this is -- we have a framework for

21   analyzing Rule 41 violations and it does not

22   distinguish when we analyze Rule 41 violations from

23   Rule 41(a), from Rule 41(b).  These are all parts

24   of Rule 41 violations, and there is no distinction

25   within the Tenth Circuit between the fact that

1    (b)(1) through (5) have these jurisdictional

2    requirements versus (a) has other technical

3    requirements about it.  They're all technical

4    violations of Rule 41.

5            THE COURT:  I don't know that I agree

6    with that.  Because in Krueger in footnote 7, the

7    court discusses the fact that we've addressed over

8    the years many provisions of Rule 41, never

9    concluding that the alleged 41 violation justified

10    suppression; however, those were 41(c), 41(d), (e).

11    At the last, it says, "Because none of these cases

12    addressed Rule 41(b)(1), which is unique from other

13    provisions of Rule 41 because it implicates

14    substantive judicial authority, they offer limited

15    guidance here."

16            So it sounds to me like they are drawing a

17    very substantive distinction between 41(b) and the

18    fact that it goes right to the heart of the

19    authority to issue the warrant versus some of the

20    other provisions, where if a copy isn't signed

21    properly or something isn't filed directly on time

22    or something like that, that wouldn't affect --

23    those sorts of violations would not have affected

24    whether the search was -- would have ever happened.

25            MR. HOFLAND:  I understand, Your Honor.

1   And you did refresh my recollection about Krueger,

2   that they do -- they do contemplate the idea of the

3   same situation that we're in, that something like

4   this we don't know we've taken up before.

5           THE COURT:  Yeah.

6           MR. HOFLAND:  But even though they drop

7   that footnote, Krueger still conducts a full

8   Pennington analysis, Pennington being the prior

9   case that gives us violations of Rule 41.

10          THE COURT:  Okay.

11          MR. HOFLAND:  So if the Tenth Circuit

12   truly believed that Rule 41(b) raised a

13   substantive-level violation, then we would have

14   seen an opinion that looked closer to Levin and did

15   continue to conduct the analysis of, was there a

16   violation, was it constitutional in nature; and if

17   not, do we have prejudice or do we have intentional

18   and deliberate disregard?

19      What's interesting, I think, for this court

20   in looking at the other district courts, at least

21   persuasively that are taking up this issue, is in

22   the Western District of Washington their circuit

23   has a Rule 41 analytical framework that is almost

24   identical to ours.

25          THE COURT:  Right.

1          MR. HOFLAND:  In theirs, they conduct

2    the Rule 41 violation analysis to say, was Rule 41

3    violated?  And in Michaud, they say it was a

4    technical violation but it was within the spirit of

5    the law.  They say it was certainly not a

6    constitutional magnitude because all of the

7    requirements of the Fourth Amendment were complied

8    with which, from our prior discussion, that looks

9    like that's not at issue here really or it doesn't

10   trouble this court.  And so it takes up the

11   question of prejudice or intentional and deliberate

12   disregard and it says that neither were met, there

13   is no prejudice, which I'll address in a second.

14          But what's also -- United States v.

15   Stamper, the other case from the Southern District

16   of Ohio, they, too, have a framework -- and now

17   we're talking about the Sixth and the -- Sixth and

18   the Ninth Circuit --

19          THE COURT:  Ninth in the Michaud case.

20          MR. HOFLAND:  Yes, Your Honor.

21          So in the Southern District of Ohio, their

22   circuit case law also mirrors what we have in

23   Pennington, which is a Rule 41 violation to be --

24   determine the questions of, is there a technical --

25   is there a violation, is it constitutional in

1  nature, and then is there prejudice or intentional

2  or deliberate disregard?

3       So on two of those cases that have taken up

4  this very issue, they walk through the steps of

5  Rule 41, because even though we're talking about a

6  Rule 41(b) violation, they don't see it the way

7  that the judge in Levin does, which is we go no

8  further, we have no jurisdiction, all stop.

9       The Seventh Circuit in United States v.

10 Epich, they don't particularly address that Rule 41

11 framework.  I think theirs is a little bit

12 different.  They simply say it's not constitutional

13 in magnitude and the good-faith exception prevails

14 here.

15      So all of these other courts, with the

16 exception of Levin being the outlier, they allow us

17 to look at good faith and they allow us to look at

18 prejudice or intentional and deliberate disregard,

19 and only Levin -- and I haven't been able to do a

20 full survey of their circuit law -- but only Levin

21 is the one who simply says, all stop, we don't even

22 reach the issue.

23           THE COURT:  Yeah.  I mean, Levin seems

24 to say that there are cases out there in support

25 for the idea that if the -- if the warrant is void

1  ab initio, good faith is not going to be -- not

2  going to be applicable.

3           MR. HOFLAND:  Right.  That's not present

4  in this -- in the other decisions that deny the

5  motion to suppress.

6           THE COURT:  No, I wouldn't think so.

7           MR. HOFLAND:  Right.  And Levin -- and

8  Levin simply is not in our circuit and doesn't have

9  the Rule 41 framework that we have.

10           THE COURT:  Right.

11           MR. HOFLAND:  So understanding that the

12  first part of Levin is -- we'll assume here that

13  there is a Rule 41 technical violation, but it's

14  not constitutional in nature, so then the question

15  comes down to prejudice or intentional and

16  deliberate disregard.

17      I think we can pretty quickly put aside

18  intentional or reckless or deliberate disregard for

19  the rules because very clearly from the warrant,

20  and otherwise, we see that law enforcement is doing

21  the best they can without knowing where the

22  activating user is based upon the conduct of the

23  activating user.

24           THE COURT:  What if the government agent

25  had -- and obviously I don't know how long the

1   proposed amendment to Rule 41 has been in the

2   works -- but what if the government agent in

3   Virginia had gone to the court and said, we have to

4   have a district judge issue this warrant --

5           MR. HOFLAND:  Well --

6           THE COURT:  -- the magistrate judge

7   isn't going to have authority, or we are concerned

8   about the magistrate judge's authority to issue the

9   warrant under Rule 41(b); therefore, we're asking a

10  district judge to do it because -- and Mr. Widell

11  seemed to agree with the idea that in that case

12  there wouldn't be the same limitation.

13          MR. HOFLAND:  Your Honor, the United

14  States respectfully disagrees with the court in

15  Levin that that is the prevailing case law across

16  this country.

17          While there's much conviction of the judge

18  in Levin to say they simply could have walked down

19  the hallway and they talk about how many districts

20  court judges would have been available, he also

21  says in a footnote that many other jurisdictions --

22  and he doesn't seem to understand why -- they

23  believe that the Rule 41 jurisdictional limitations

24  apply to district court judges.

25          There is nothing that we've been able to

1    find in our research that indicates that somehow

2    district court judges are free from the same

3    limitations.  And now I can't recall what the

4    citation is, but I believe it's Federal Rule of

5    Procedure 1, 2, or 3, which ultimately are going to

6    say that the district court judges do not have this

7    unbridled authority that Levin seems to argue they

8    do.

9              THE COURT:  But they certainly would

10   have more authority than the magistrate judges

11   because, as Gorsuch pointed out that in the

12   concurrence that you mentioned in Krueger -- I

13   mean, we've also got the Federal Magistrate Act to

14   deal with here, which imposes jurisdictional and

15   territorial limits on what a magistrate judge can

16   do.

17             I mean, as a magistrate judge, I'm a

18   magistrate judge of this district, but the district

19   judges, I think, arguably are judges of the United

20   States.  They're appointed by the President and

21   they sit in a particular district, but I don't know

22   whether -- I'm not sure whether they would have the

23   same sorts of limitations on them.

24             MR. HOFLAND:  Yes, Your Honor.  And I

25   can say with certainty that the agents in the

1    Eastern District of Virginia, if somebody had came

2    down with an opinion and there was case law

3    supporting it, that you could simply get this from

4    an unknown location if you go to a district court

5    judge, they would have gone to a district court

6    judge.

7         I don't think it's as clear as the judge

8    indicates in Levin.  From my last 18 months of

9    being in this district practicing, I don't know a

10   single instance in which a district court judge has

11   issued a warrant.

12        THE COURT:  I don't know that they've

13   been asked to.  But yeah, I agree that probably it

14   hasn't happened.

15        MR. HOFLAND:  So it's not clear to me

16   that what the judge in Levin says applies.  And he

17   even drops a footnote where he indicates many other

18   learned courts believe that the Rule 41(b)

19   jurisdiction applies to district court judges as

20   well as magistrate court judges.

21        So for what it's worth, if there is a -- if

22   there's a small area of the law that says that

23   district court judges can issue extraterritorial

24   warrants, I imagine that there will be an uptick of

25   warrants sought from district court judges for

1    situations like these.  But even in that was

2    available to the law enforcement in the Eastern

3    District at the time, it's apparent that they

4    weren't aware of that or else we would have

5    attempted to cure that problem.  So even that sort

6    of question falls into a good-faith exception

7    analysis.

8          So intentional and deliberate disregard for

9    the rules, I think it's pretty clear that that

10   hasn't been proven by the defense.  The Rule 41

11   framework requires the defense to prove these

12   harms, either prejudice or intentional and

13   deliberate disregard.  I don't believe, even from

14   the briefing that touched on that, that we have

15   intentional or deliberate disregard of any rule.

16   The fact that we're talking about it the way we are

17   indicates that -- that as a certainty it would be

18   -- would be far beyond what it actually was.

19          THE COURT:  I don't think there was much

20   -- Mr. Widell, do you agree with that, that this is

21   not an intentional and willful violation?  Are you

22   willing to concede that or --

23          MR. WIDELL:  Your Honor, I think we'd

24   prefer to stand on the -- on the brief.

25          THE COURT:  Okay.

1       MR. HOFLAND:  But then, Your Honor,

2   there's a question of prejudice, and prejudice is

3   taken up by all of these other districts that I

4   mentioned that go through the Rule 41 --

5       THE COURT:  Of the ones you mentioned,

6   the four cases you mentioned, Michaud, Stamper,

7   Levin, and then Epich, did any -- did they all find

8   -- I know that in Michaud and Levin they did --

9   that the warrant was in violation of Rule 41?

10      MR. HOFLAND:  They did, Your Honor.

11  They all found that there was at least a technical

12  violation of Rule 41.  The Southern District of

13  Ohio in Stamper effectively concurs almost across

14  the board with the court in Michaud.

15      THE COURT:  Okay.he did.

16      MR. HOFLAND:  Epich is a little bit

17  different in light of it being in the Seventh

18  Circuit and the case law doesn't quite mirror up

19  with ours.  So to my recollection in Epich, because

20  they rely upon good faith and they don't have the

21  same analysis in the Rule 41 framework, I don't

22  know that they reach prejudice.

23      THE COURT:  They just find that what,

24  that there was good faith -- that there was good

25  faith for the -- again, I assume there was a second

1   warrant as there was here --

2              MR. HOFLAND:  Yes, Your Honor.

3              THE COURT:  -- based on the first one

4   and that it was good faith to act upon that

5   warrant?  Or that --

6              MR. HOFLAND:  They take up the NIT

7   itself, Your Honor.  So they say it's good faith

8   that the NIT was achieved in the manner it was.

9              THE COURT:  Okay.

10             MR. HOFLAND:  To my knowledge, nobody

11  has attempted to suppress on its own --

12             THE COURT:  The second one.

13             MR. HOFLAND:  -- the validity of the

14  second warrant.

15             I put in my briefing there actually was a

16  want to proceed with the NIT warrant, so when we're

17  talking about second I understand you to mean the

18  one in the local district.

19             THE COURT:  Right.  The Oklahoma

20  warrant.

21             MR. HOFLAND:  But when they take up the

22  issue of prejudice, they take up the issue both

23  times in favor of the United States in Michaud and

24  in Stamper and they say that we don't have

25  prejudice that would rise to suppression.

1      I understand the defense's argument to be

2  because the warrant had this information, which is

3  a violation, they couldn't have gotten the warrant,

4  and if they couldn't have gotten the warrant, we

5  wouldn't have the information to do a separate

6  warrant.

7      The courts in both Michaud and Stamper,

8  they both reject that as being the rein of

9  prejudice because very clearly we're talking about

10  a Rule 41 violation.  And so if there is a problem

11  with the warrant, basically every warrant would be

12  invalidated and we wouldn't be able to get the

13  information.

14      The defense invites us to say that we can't

15  even go figure out how we could have cured it, it's

16  simply that this one wasn't valid and this is the

17  one that we used, so as a result it has to be

18  everything invalidated.  And the court says that

19  that can't be the right reading of Rule 41 because

20  we already are assuming a Rule 41 violation and

21  then we're getting down to the issue of prejudice.

22      The interesting part is that both of these

23  courts in Michaud and Stamper, they turn to the

24  evidence being sought to determine prejudice.

25  Because ultimately the information gleaned from the

1    NIT is not Mr. Arterbury's address or Mr. Arterbury

2    himself, it is an IP address, an IP address which

3    the user freely puts out on the Internet and must

4    put out on the Internet in order to get any sort of

5    Internet traffic.  They freely share it with their

6    Internet service provider who knows that

7    information.

8         So when they come down on the issue of

9    prejudice, effectively they're saying there is no

10   prejudice because there's no reasonable expectation

11   of privacy for the defendant in his IP address, he

12   puts it out there even when he's going to this

13   particular site.  And to say that because it's

14   encrypted now we add a level of privacy, can't be

15   right because then we're simply saying if you

16   conceal your criminal activity well enough, you're

17   beyond the reach of the law.

18           THE COURT:  Well, but if you're -- if

19   you're conducting your criminal activity in your

20   house, you would need a valid warrant to go into

21   the house.  I mean, sure, it's being concealed but

22   you would need a valid warrant to get in there.

23        And isn't that the question here, whether

24   this is a valid warrant to get into the computer

25   and then get the information?

1    MR. HOFLAND:  It's not when we're

2    talking about an IP address.  I mean, effectively

3    an IP address is a house made of glass.  The person

4    in all of their activities are pushing out and

5    emitting from their house what they're doing.

6         And so, too, did Mr. Arterbury in this

7    case.  When he navigated, even through the Tor

8    network, he was pushing out to his Internet service

9    provider and to the first entry node in these relay

10   of nodes here's who I am.  And there is a --

11   THE COURT:  And then you sign up -- as I

12   understand it, you sign up for the Tor network, as

13   it were, and provide that basic information, and

14   then from there on once you're part of that network

15   or using that network, everybody understands that

16   we're here to -- to cloak everything you do in

17   anonymity so you can't -- you know, it will be very

18   difficult to catch you.

19   MR. HOFLAND:  That is true, Your Honor.

20   THE COURT:  And as I read it, 80 percent

21   of what's going on down there is child pornography

22   related.

23   MR. HOFLAND:  At least there's some

24   articles and studies that suggest the same, yes,

25   Your Honor.

1              THE COURT:  All right.

2              MR. HOFLAND:  The very fact of joining

3    on this network, and understanding that there is an

4    entry node who knows all of your information

5    unencrypted and then at subsequent nodes that add

6    layers of encryption all the way to the exit node,

7    and then you can't see who that individual user is,

8    the base activity that each authorizing user or

9    each computer defendant is doing is going onto the

10   Internet and thereby projecting who he or she is.

11   And so as a result, routinely case law has been --

12   has been shown that there is no reasonable

13   expectation of privacy in an IP address.  So it's

14   not a Fourth Amendment search when we obtain an IP

15   address.  Now, I understand that we have a little

16   bit different case here, but at least as property

17   being sought, there's no reasonable expectation of

18   privacy in an IP address.

19              And so because of that, and we're taking up

20   the issue of prejudice, these other courts have

21   said that there is not prejudice when we're talking

22   about, almost in a balancing manner, what the

23   violation was with respect to what the information

24   ultimately sought was.  The NIT itself did not give

25   us Mr. Arterbury.  The NIT itself did not reach to

1    his address.  It was, we received an IP address and

2    further investigation needed to be done, an

3    administrative subpoena had to be issued to an

4    Internet service provider, and at that point we

5    then have a specific user.

6            So just as the other courts have done and

7    found no prejudice in light of the circumstances --

8    and I think we can get there by either talking

9    about the lack of reasonable expectation of privacy

10   in an IP address, something that he freely gives

11   every time he goes on the Internet, or we can get

12   there by talking about exigent circumstances -- was

13   there another way for us to get this information?

14   Sure.  If the magistrate judge in the Eastern

15   District of Virginia said, I'm not going to

16   authorize that, I believe that this NIT still could

17   have been sent out under exigent circumstances

18   based upon the fleeting nature of the evidence and

19   based upon the great harm that was occurring to

20   young kids who were rescued from that harm, that as

21   a result even if we -- that if this warrant hadn't

22   existed, we still would have had exigent

23   circumstances to send the NIT out over the network.

24           So for -- for those -- and what kind of

25   goes hand in hand with that -- and I think I

1  already somewhat addressed it -- is this good faith

2  and I think there's good faith all over this.  I

3  think if there's an ability to have a good-faith

4  exception in this case, and we're not finding the

5  way the Levin court did, but ab initio we don't

6  there, then I think it's clear that Leon in good

7  faith says these are people who are trying to use

8  court authorization to do exactly what they did,

9  not rely upon exigency, but use court

10  authorization, the only place that they would have

11  known how and where to go, and they sought a

12  warrant.

13        So the good-faith exception applies.  The

14  fact that there is this new technology and one that

15  criminal defendants are using to hide their

16  criminal activity, that shouldn't inure to the

17  benefit of those criminal defendants.

18        So for those reasons that I've laid out, I

19  think barring any questions that you have now, I

20  think that's it.

21        THE COURT:  All right.  Let me see if

22  Mr. Widell has anything he wants to say in

23  rebuttal.

24        MR. WIDELL:  I think just briefly, Your

25  Honor.

1        In regard to the exigent circumstances

2    that's already been raised, that the government

3    can't create the exigent circumstance, that amounts

4    to a run-around the warrant for, and that's exactly

5    what it did in this case.

6        The second thing is the IP address.  To say

7    that there is a bright-line rule that says an IP

8    address is -- if I have my IP address written on a

9    piece of paper and that piece of paper is in my

10   house, and the government comes into my house and

11   picks up that piece of paper without a warrant,

12   they've done something that's suppressible

13   regardless of whether I use my IP address publicly.

14       This is a case in which the individual

15   didn't willingly give up his IP address.  He did

16   something exactly the opposite.  He had an

17   expectation of privacy at least in this instance.

18   So --

19            THE COURT:  But does it matter that what

20   the defendant -- certainly in the government's view

21   what the defendant is doing is hiding his

22   activities arguably for illegal purposes?

23            MR. WIDELL:  I don't -- I don't know why

24   that would matter.  Every criminal case that we've

25   -- we get that's a Fourth Amendment case or a Fifth

1    Amendment case is a criminal purposes case.  So I

2    can't see why, you know, the Fourth Amendment

3    applies to all of us.

4          I think that's all I want to say in

5    rebuttal, Judge.

6          THE COURT:  All right.  Assuming that

7    you're correct, that the pretrial has been moved,

8    I'll check on that and see where we stand.  But

9    whatever I do on this, I'll try to do as quickly as

10   I can, and then I'll need to probably shorten your

11   time because I'm convinced that whichever way I go

12   on this, there's going to be objections from

13   somebody on the report and recommendation.

14        So would a week be sufficient?  I mean,

15   sounds like -- I mean, you've briefed this thing

16   pretty authoritatively.  I would I think you'd be

17   basically presenting the same arguments to Judge

18   Payne.

19        MR. WIDELL:  Yes, sir.  A week is fine.

20        THE COURT:  Okay.

21        MR. HOFLAND:  Yes, Your Honor.  And I'm

22   sorry.  Just one other case cite for the sake of

23   the premise that the IP address -- the use of Tor

24   does not alter the public nature of the IP address.

25        In the Ninth Circuit -- again this is out

1  of Michaud's district -- United States v.

2  Forrester, 512 F.3d -- I just have a citation at

3  510, that stands for an IP address belongs to the

4  ISP, the Internet service provider, not the user.

5          And then Michaud itself --

6          THE COURT:  Well, does that mean you

7  would have to get the warrant to get -- well, it

8  goes -- ultimately you do get the warrant for the

9  ISP provider?

10          MR. HOFLAND:  We do, Your Honor.  Or at

11  least an administrative subpoena.

12          THE COURT:  But only because you've at

13  least learned who the likely ISP -- when you get

14  the information that comes from Arterbury's

15  computer, you know the IP address.  What does that

16  enable you to do?  Are you able to tell from that

17  that it came from the Northern District of

18  Oklahoma?  Or what does that tell you exactly?

19          MR. HOFLAND:  Yes, Your Honor.  There

20  are publicly available resources that allow you to

21  put in an IP address and then push out what

22  company, Internet service provider, owns that IP

23  address and then also they can geolocate --

24          THE COURT:  Geolocation.  And so what

25  happens then?  The case -- somehow the case is

1    referred to authorities here in the Northern

2    District for further action and they've got the IP

3    address.  They get the information they need.

4    They're relying on probable cause established by

5    the NIT warrant to come to Judge Wilson and say,

6    based on what we -- what we gained through use of

7    the NIT warrant, and now what we've gained through

8    the administrative subpoena that was served on Cox

9    Communications, we now know the physical address of

10   the activating computer and we want a warrant to go

11   in there and search that computer to see if there's

12   child pornography.

13              MR. HOFLAND:  That's right, Your Honor.

14   And we agree that in terms of suppression, if the

15   NIT warrant is suppressed, that was effectively

16   wholly the basis of probable cause to get to that

17   house.

18              THE COURT:  Right.

19              MR. HOFLAND:  But yes, Your Honor, the

20   -- and maybe I didn't articulate it correctly, and

21   certainly a review of the warrant, I think, lays

22   this out -- but the Internet service provider owns

23   the IP address and basically, you know, leases it

24   to all of the users who connect through Cox or

25   Comcast or otherwise, and then that is a unique

1  identifier for that person's actions but it's owned

2  by the ISP.

3         And then Michaud, which we've talked about,

4  but then also a case called United States v.

5  Farrell from the Western District of Washington --

6  Farrell being F-a-r-r-e-l-l -- it's 2016 WL 705197.

7  It, along with Michaud, takes up the idea that

8  simply because a user uses Tor, it doesn't alter

9  the premise that an IP address is owned by these

10  ISP's and does not have a reasonable expectation of

11  privacy in those IP addresses.

12         THE COURT:  But you still have to get

13  back to his computer to get the basic information

14  that gets you to the ISP provider?

15         MR. HOFLAND:  Yes, Your Honor.  But when

16  we're talking simply about the expectation of

17  privacy and the information to be sought, there is

18  none, even if he's using Tor.

19         MR. WIDELL:  And from our perspective,

20  the information was contained in the computer in

21  the house.

22         THE COURT:  Right.

23         MR. WIDELL:  And so he had an

24  expectation of privacy in what was in his house,

25  particularly in what was in his computer.  That's

1    it.   Thanks.

2              THE COURT:   I think that pretty well

3    sums it up.

4         Okay.   Thank you, gentlemen.   It's an

5    interesting issue.   We'll try to get something out

6    on this quickly so you can discuss it with Judge

7    Payne.

8              MR. HOFLAND:   Thank you, Your Honor.

9              THE COURT:   Thanks.

10             (The proceedings were concluded)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4           I, Brian P. Neil, a Certified Court

5    Reporter for the Northern District of Oklahoma, do

6    hereby certify that the foregoing is a true and

7    accurate transcription of my stenographic notes and

8    is a true record of the proceedings held in

9    above-captioned case.

10

11          I further certify that I am not employed

12   by or related to any party to this action by blood

13   or marriage and that I am in no way interested in

14   the outcome of this matter.

15

16          In witness whereof, I have hereunto set my

17   hand this 12th day of May 2016.

18

19                    s/ Brian P. Neil
                      _____
20                    Brian P. Neil, RMR-CRR
                      United States Court Reporter
21

22

23

24

25